UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
CHRISTOPHER E. DAVIES,                           :
                          Petitioner,     :
                                          :        **OPINION AND ORDER**
 v.                                               :
                                          :        16 CV 6542 (VB)
SALLY K. DAVIES,                                 :
                          Respondent.      :
------------------------------------------------------------x

Briccetti, J.:

       Petitioner Christopher E. Davies seeks an order directing the return of his son, K.D., to

French St. Martin, pursuant to the Hague Convention on the Civil Aspects of International Child

Abduction ("Hague Convention"), as implemented in the United States by the International

Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001-9011.

       Before the Court is Mr. Davies's Verified Petition for Return of the Child to Saint

Martin.  (Doc. #1).

       For the following reasons, the petition is DENIED.

       The Court has subject matter jurisdiction pursuant to 22 U.S.C. § 9003(a) and 28 U.S.C.

§ 1331.

## FINDINGS OF FACT

       The Court held a nine-day bench trial on November 14-18, 21-22, and 28-29, 2016,

during which petitioner, respondent, nine other fact witnesses, and five expert witnesses testified.

Based on that testimony, as well as the parties' stipulation of undisputed facts (Doc. #36), and

the exhibits received into evidence,[1] the Court makes the following findings of fact.

---

[1]      Among the exhibits received into evidence were several declarations under penalty of perjury submitted by both parties, from individuals not called as witnesses at trial.  The Court has carefully reviewed each declaration and finds that none of the information contained therein

I.     Undisputed Facts

Respondent Sally K. Davies ("Ms. Davies"), was born in Denmark and raised in New York.  She is a citizen of the United States and the United Kingdom.  Petitioner Christopher E. Davies ("Mr. Davies") was born in and is a citizen of the United Kingdom.

Mr. and Ms. Davies were married on June 10, 2006, in Croton-on-Hudson, New York. They lived in the Bahamas for the first few months of their marriage, then moved back to the United States, where they initially lived with Ms. Davies's parents in Croton-on-Hudson and then rented their own apartment in Mount Kisco, New York.   In December 2007, the couple moved to Thailand, where they worked as scuba diving instructors for a few months, before traveling and working in other international locales for a few additional months.  Then, in June 2008, they moved to the Caribbean island of St. Martin,[2] where they purchased a scuba diving center, Octopus Diving SARL.  The parties' residence was located on the same property as this business.

In 2012, in French St. Martin, Ms. Davies gave birth to K.D., who is the subject of this petition.

In December 2014, the parties established a second business, Octopus Diving SXM, NV, on the Dutch side of the island.

The parties lived together with K.D. in Grand Case, French St. Martin, until July 8, 2016.

From July 8-18, 2016, Mr. Davies stayed at a friend's house and then at a hotel.

---

alters the Court's conclusions in any respect.  There was sufficient evidence presented by both sides at trial, in particular through live witnesses subject to cross-examination, for the Court to make the findings of fact and conclusions of law contained in this Opinion and Order.

[2]     St. Martin is divided into two territories, one belonging to France ("French St. Martin"), and the other to the Kingdom of the Netherlands ("Sint Maarten").  The parties lived in French St. Martin during the relevant period, but worked at least part of the time in both territories.

On July 18, 2016, Ms. Davies left St. Martin with K.D. for New York, without Mr. Davies's knowledge or consent.  Prior to this, K.D. never resided anywhere other than French St. Martin.  Ms. Davies and K.D. currently reside at Ms. Davies's parents' house in Croton-on-Hudson.

II.      Violence and Psychological Abuse

The central questions presented here relate to whether and to what degree Ms. Davies and K.D. were the victims of violence and psychological abuse at the hands of Mr. Davies.  Based on the evidence adduced at trial, the Court makes the following findings of fact and credibility determinations.

A.      Early Marriage

Ms. Davies credibly testified that Mr. Davies did not get along well with Ms. Davies's family and, as a result, within the first year of their marriage Ms. Davies's relationship with her family, and in particular with her sister, began to deteriorate.

Ms. Davies also credibly testified that unbeknownst to her, in 2007, Mr. Davies applied for diving instructor jobs for both himself and Ms. Davies in Thailand, and when those applications were accepted, she "felt [she] had no choice but to go."  (Tr. at 35).  Ms. Davies therefore resigned from her job as a school teacher four months into the school year.

Once the parties purchased Octopus Diving in June 2008, they were both working full-time running the company.  According to Ms. Davies, this is when their relationship changed.  She testified that Mr. Davies began to "criticize and find fault in almost everything that I would do concerning the business," from "a typo in an email" to Mr. Davies's disapproving of the way Ms. Davies "tied up the lines on the boat," or "taught a scuba class," or the way she "interacted with the employees."  (Tr. at 38).  She testified that Mr. Davies would "berate [her] for long

periods of time . . . sometimes yelling and . . . getting more and more emotional about it[, a]nd angry about it." (Id.). She credibly testified that Mr. Davies also got mad at small domestic infractions, such as if she "didn't do the dishes or if the bedroom was messy or if there were clothes on the floor." (Id. at 40). In addition, Mr. Davies began to read Ms. Davies's private emails during this period, so she started typing portions of emails in white font so Mr. Davies would not know what she had written. Ms. Davies also credibly testified that during this period, she began to have a feeling of "fuzziness" when Mr. Davies would berate her. She described this as feeling unable to think clearly or form complete thoughts, unable to cope, having her limbs feel "heavy" and her body "shut down," and feeling an "overwhelming sadness that just clouds everything and makes it impossible to function." (Id. at 96-97). In addition, Ms. Davies credibly testified that beginning in 2010, Mr. Davies began to "throw[] things and slam[] doors and punch[] doors." (Id. at 44).

    B.    Ms. Davies's Pregnancy

    According to Ms. Davies, during her pregnancy with K.D. she suffered from sea sickness when she was out on the scuba diving boats. Nevertheless, Mr. Davies made her continue to take divers out on scuba trips because if she did not "pull [her] weight then [she] would get in trouble with" Mr. Davies. (Tr. at 58). She credibly testified that when Mr. Davies got angry during this period, he would scream, throw things, slam doors, and threaten to fire staff.

    Ms. Davies also testified that after she became pregnant, the frequency of Mr. Davies's verbal assaults increased. She testified "it took him less to get mad . . . [h]e got mad more often," and when he got mad, "he yelled and screamed for longer." (Tr. at 60). At least once, Mr. Davies's anger toward Ms. Davies caused her to convulse to the point where she feared the baby's health was in jeopardy.

Mr. Davies also became more controlling during this period.  Mr. Davies told Ms. Davies what she could and could not eat; where she could go; to whom she could talk; and that when they went out, she had to stand next to Mr. Davies.

      C.      <u>Abuse After K.D.'s Birth</u>

Ms. Davies credibly testified that after K.D. was born, Mr. Davies's "verbal attacks became more frequent . . . more violent . . . lasted for longer[, a]nd it took on another level."  (Tr. at 82).  Mr. Davies's violence and physical threats also increased.  In particular, he would throw laundry at Ms. Davies, throw glasses, throw tools, and would scream at her "right in [her] face," and poke her or push her out of the way.  (<u>Id</u>. at 82).

In addition, Ms. Davies credibly testified that Mr. Davies's controlling behavior continued after K.D. was born.  When Ms. Davies would go out to dinner with friends, Mr. Davies would call and text her, and pressure her to leave before the dinner was done by saying things like "a normal wife wouldn't stay out this long and you need to come home."  (Tr. at 99).

Specific examples of this abuse were also provided through testimony from several non-party witnesses.  First, a childhood friend of Ms. Davies, Helen Roberts, credibly testified about the parties' relationship and several specific incidents she witnessed.  The Court has considered that Roberts is not an impartial witness because she is a lifelong friend of Ms. Davies.  However, the Court found Roberts to be credible, and found her testimony to be consistent with that of Ms. Davies and several other witnesses at trial.

In 2013, Roberts traveled to St. Martin with several other mutual friends for a bachelorette party.  Roberts described Ms. Davies having to leave the celebrations early because Mr. Davies "ke[pt] calling her and . . . making it unbearable for her, telling her that she should go home[,] making lots of phone calls until she went home," and testified this made Ms. Davies

"very upset and . . . humiliated." (Tr. at 905-06). In addition, while Roberts was visiting Mr. and Ms. Davies in St. Martin in 2015, she witnessed Mr. Davies "frequently" scream and push Ms. Davies out of the way. (Id. at 908).

Similarly, Lisa Wightman, a family friend, credibly testified regarding what she perceived to be an "incredibly awkward moment" when she visited the parties in 2014. (Tr. at 552). Specifically, Ms. Davies was making a chickpea salad when Mr. Davies came up to her and told her she "was making it wrong." (Id.). Mr. Davies had an "irritated pissed off look" on his face, and took over making the salad. Ms. Davies "just dropped her hands to her side and just moved over," with "no comment . . . it was [Mr. Davies] was going to take over and do this." (Id.).

A third witness, Elizabeth Chafin, who worked for Octopus Diving on the French side of St. Martin from approximately January to September 2015, and then on the Dutch side for an additional three to four months, also credibly testified to similar behavior. Chafin had frequent opportunities to see the parties interact with one another and with K.D. because the business was on the same property as the Davies's home. She said she witnessed Mr. Davies "yelling at [Ms. Davies], becoming really irate and angry." (Tr. at 948). She also testified that Mr. Davies is "quite a bit taller than [Ms. Davies], so a lot of the times, he would be in her face . . . towering over her, getting red in the face, and flailing his arms about, just getting really angry, slamming things" such as "doors . . . equipment . . . things around the shop, [such as] papers." (Id.). According to Chafin, these outbursts resulted from "normal business interactions." (Id.). Chafin described the demeaning and insulting nature of the things Mr. Davies would say, such as telling Ms. Davies that what she was doing was "so easy a monkey could do it." (Id. at 949). And she testified these interactions were frequent.

6

To try to respond to the angry outbursts directed at her during this period, Ms. Davies became "hypervigilant" about meeting Mr. Davies's needs and desires.  (Tr. at 96).  She also again described feeling "fuzzy" after Mr. Davies would yell at her.  (Id.).

D.   Violence Directed at K.D.

Ms. Davies credibly testified that when K.D. was a baby, Mr. Davies frequently grabbed K.D. from Ms. Davies's arms, screamed at him, and called him names, like "ignorant piece of shit" and "spoiled brat."  (Tr. at 103).  Ms. Davies also testified that Mr. Davies wanted "respect" from K.D. and would yell at him when K.D. would be the slightest bit obstinate.  (Id. at 102).  She testified that "a lot of the things that [Mr. Davies] was doing to [her] [she] could see that he was doing to K.D."  (Id.).

Ms. Davies also credibly testified regarding numerous incidents of aggressive overreaction by Mr. Davies toward K.D., or toward Ms. Davies in front of K.D., because of something K.D. had done.   For example, on at least one occasion, Mr. Davies slammed on the car brakes when K.D. refused to put on his seatbelt or yelled in the car, causing K.D. to lurch forward.  Also, Mr. Davies once snatched a toy car from K.D. because he was rolling the car on the hood of Mr. Davies's truck, and then screamed at Ms. Davies in front of K.D. because Ms. Davies "didn't react fast enough to stop [K.D.] from doing it."  (Tr. at 332).  In June 2016, when K.D. accidentally knocked over Mr. Davies's beer, Mr. Davies "hurl[ed] the beer across the room," and threw his phone.  (Tr. at 590).

Ms. Davies also credibly testified that K.D. was frequently present and witnessed Mr. Davies's violent behavior.  She described K.D. witnessing Mr. Davies throw their puppy across the room, breaking the puppy's leg.  Mr. Davies frequently screamed at Ms. Davies while she

was holding K.D. in her arms, and "would sometimes grab K.D. from [her] arms and rip him away" from her.  (Tr. at 84).  She testified she became concerned for K.D.'s safety.

Ms. Davies also credibly testified that Mr. Davies "scream[ed] in her face" on one occasion "because K.D. wanted to sleep with [Ms. Davies]."  (Tr. at 333).  Ms. Davies also described an incident during which Mr. Davies slapped K.D. on the behind, leaving a hand print. In addition, Mr. Davies threw one of K.D.'s toys across the room, where it hit a wall, upsetting K.D.  An argument ensued between Mr. Davies and Ms. Davies in their bedroom.  K.D. came to the room, but Mr. Davies pushed him forcefully out of the room and slammed the door.

Ms. Davies also presented credible corroborating evidence of Mr. Davies's inappropriate behavior towards K.D.  For example, Helen Roberts testified that during her visit to St. Martin in 2013, she witnessed Mr. Davies "grab[] [K.D.] from his highchair and scream[] at him for throwing food on the floor," causing K.D. to cry and get "really upset."  (Tr. at 906).  Roberts also described witnessing Mr. Davies scream at Ms. Davies "right in her face," during an incident in January 2015, while K.D. was in Ms. Davies's arms.  (Id. at 907).  According to Roberts, Mr. Davies also yelled at Ms. Davies because she left a glass on an outdoor table.

Roberts also described Mr. Davies yelling at Ms. Davies in front of K.D. while Ms. Davies folded laundry, some of which was on the floor.  Roberts testified that Mr. Davies "pick[ed] up the laundry and thr[e]w[] it at her face."  (Tr. at 907).  She said K.D. hid behind a chair while this took place.

In addition, Roberts testified that during her visit to St. Martin in 2015, she observed Mr. Davies get mad at K.D. for not using his "inside voice," and "grabbed K.D. from [Ms. Davies's] arms and shouted at him, and then he sort of thrust . . . him back into [Ms. Davies's] arms so hard that she . . . had to step back to brace herself."  (Tr. at 908).

Similarly, Elizabeth Chafin testified that in 2015, she witnessed Mr. Davies get angry at K.D. on numerous occasions.  She testified Mr. Davies's response to normal child behavior was "pretty disproportionate to whatever it was that was going on."  (Tr. at 950).  He would "get angry and yell, sometimes . . . grabbing K.D. out of [Ms. Davies's] hands, going into the house and slamming the door."  (Id.).  Also, Mr. Davies would often be upset about something unrelated to K.D. and misdirect his anger at K.D.  Chafin described incidents like this one as being "run-of-the-mill."  (Id. at 952).  Chafin said K.D. would react to these outbursts by crying, yelling back, or "sometimes . . . just get[ting] really quiet and shut[ing] down."  (Id. at 950).  Chafin also testified that on a couple of occasions when Mr. Davies acted violently towards Ms. Davies in front of K.D., K.D. stepped between his parents and said things like, "no more yelling, daddy, daddy, stop yelling at mommy."  (Id. at 949).

E.    Violence Towards Others

Mr. Davies's treatment of others lends further support to the Court's conclusion that he has an uncontrollable temper, serious anger issues, and a willingness to take the law into his own hands when he feels it necessary.

First, Lisa Wightman recounted an incident in 2011, during which Mr. Davies became enraged at an individual driving a vehicle behind the one occupied by Wightman, her family, and the Davies family.  When they arrived at their destination, Mr. Davies noticed the vehicle belonging to the individual with whom he had become angry parked in the same parking lot. Wightman testified that while she, her husband, and several of their children were nearby, she witnessed Mr. Davies take his keys out of his pocket and go "from the back of the truck all the way up to the front of it and stuck [the key] into the side of the man's vehicle," creating a "visible scratch."   (Tr. at 548-49).  Wightman said Mr. Davies laughed after he had done this.

Wightman also described watching Mr. Davies get extremely angry at a female employee in front of Wightman and her children in 2012.  According to Wightman, Mr. Davies "started swearing," his "hands started flailing," and his "face turned red."  (Tr. at 550).  Wightman testified "there was always something that happened that pissed [Mr. Davies] off," and there were moments she "felt [so] uncomfortable . . . that [she] would actually grab [her husband's] knee and squeeze."  (Id. at 551).  Wightman testified she observed Ms. Davies "shrink back" and "go inside herself" in reaction to Mr. Davies's angry outbursts.  (Id. at 553).

Helen Roberts testified she witnessed Mr. Davies "get really angry and scream and shout around other people on the road . . . [and] [c]all them names."  (Tr. at 908).  She said this happened "the majority of times" she was a passenger in a car being driven by Mr. Davies, and that K.D. was present during at least some of these occasions.  (Id. at 909).

Roberts also testified regarding a time when Mr. Davies learned he had bought a boat from someone who was not the boat's owner, and Mr. Davies stated in front of Roberts, her husband, Ms. Davies, and K.D. that he "was going to get his boys to deal with it and have the guy's shit kicked out of him or even killed to remedy the situation."  (Tr. at 909).  K.D. was sitting on Ms. Davies's lap when Mr. Davies made these threats.

Elizabeth Chafin credibly testified regarding inappropriate behavior on the part of Mr. Davies directed toward Chafin and her boyfriend.  After a disagreement she had with Ms. Davies regarding a diving-related emergency, Mr. Davies called Chafin on the phone and screamed and yelled at her.  Mr. Davies threatened to injure Chafin's boyfriend, and she found the experience "pretty terrifying."  She was so "scared for [her] own safety and for that of [her] boyfriend," that they chose to stay with friends for the remainder of their time on St. Martin because Mr. Davies "kn[ew] where [Chafin and her boyfriend] lived."  (Tr. at 951).

Kyle Thorpe, an employee of Octopus Diving from April to July 2016, credibly testified that after Ms. Davies left St. Martin, he witnessed Mr. Davies kick one of their dogs causing the dog to fly six to eight feet in the air.

On cross-examination, Mr. Davies was confronted with emails he had sent containing explicit threats of violence against others.  In one email, dated May 7, 2012, Mr. Davies told Ms. Davies that their employee, Sven, should "look over his shoulder every five minutes wondering who's going to beat the fuck out of him."  (Tr. at 1233).  About one customer who left a bad review about Octopus Diving on TripAdvisor, he emailed Ms. Davies on February 6, 2012, "the point is that this cunt came here with one intent, to fuck us.  So eye for an eye, tooth for a tooth, I'm coming for ya.  He will pay." (Id. at 1239).

Notably, Mr. Davies presented very little evidence to counter that presented by Ms. Davies.  He called Angie Witteveen, a <u>current</u> employee of Octopus Diving, who testified she never witnessed the parties argue and never witnessed Mr. Davies act inappropriately toward K.D.  The Court found this witness credible, but found her testimony of limited probative value.  In particular, Witteveen works on the Dutch side of the business, so she had fewer opportunities to observe the parties together and with K.D.  Also, she has an interest in keeping her current job with Mr. Davies, so while the Court credits her testimony, it nonetheless notes she has a personal reason for testifying on Mr. Davies's behalf.

Mr. Davies also called Delphine Stervinou, who is the director of the school K.D. attended in St. Martin.  She testified she observed Mr. Davies come regularly either to drop K.D. off at school or to pick him up from school.   She testified K.D. was glad to see both of his parents when one or the other picked him up from school.  However, she also testified she had very limited interaction with the parents; she was not K.D.'s teacher and she did not see either

party or K.D. outside the confines of the school.  Therefore, although Stervinou was a credible witness, her testimony was of very limited probative value on the issues central to this case.

The same is true of Josette Sanon, the parties' housekeeper and babysitter whom Mr. Davies also called as a witness at trial.  She testified she did not see anything troubling about the interactions between Mr. Davies and either Ms. Davies or K.D.  However, her observations of interactions between the parties were limited.  When asked whether she ever heard Mr. Davies yell under any circumstances, she responded, "No, because he was not at home very often.  He leaves early and he comes back late." (Tr. at 1035).  Sanon said she did not see any bruising on either K.D. or Ms. Davies, but that is also of limited relevance, as the allegations of abuse here are primarily psychological in nature.  Accordingly, the Court accepts Sanon's testimony as substantially true, but does not find it to be significant.

Finally, the parties stipulated regarding what Richard J. Torrisi would have said had he been called to testify at trial.  Torrisi supervised a visitation between Mr. Davies and K.D. that took place in and around Croton-on-Hudson on November 19, 2016 (during the trial of this case).  Among other things, Torrisi observed Mr. Davies "show[ing] a lot of patience in helping K.D." assemble a toy truck, and observed K.D. tell Mr. Davies he wanted to return to St. Martin, and cry when he was being returned to his mother's care after the visitation.  (PX 64).  The Court finds this testimony believable, but not particularly relevant to the issues at hand.  The Court has no doubt that Mr. Davies loves and misses his son and that K.D. loves and misses his father.

F.    Sexual Abuse

Ms. Davies testified that beginning after the couple moved to French St. Martin, Mr. Davies also began to abuse her sexually.  In particular, Mr. Davies would not stop having sex with Ms. Davies when she asked him to, he dismissed her requests to be gentler, and he

forcefully restricted her movement during oral sex so that she would gag and, sometimes, vomit. In addition, after K.D. was born, Mr. Davies began to strangle Ms. Davies during sex, and he would pinch her nose closed during oral sex, which made it difficult for Ms. Davies to breathe.

The Court finds this testimony credible, but gives it little weight, for several reasons. First, Ms. Davies did not complain to her therapist, Dr. Susan Heitler, or to anyone else about this sexual mistreatment before she left St. Martin.  In fact, in filling out a questionnaire for Dr. Heitler, Ms. Davies stated she had never experienced physical or sexual abuse and never witnessed domestic violence.  (PX 53 at 8).  Instead, the allegations of sexual abuse first came to light during Ms. Davies's interview with Dr. Stephanie A. Brandt, which was in contemplation of this litigation.  Second, unlike Ms. Davies's testimony on other topics, this testimony is not – and plainly cannot easily be – corroborated by other fact witnesses.  Finally, the sexual abuse is of limited relevance to the inquiry here because it did not take place in front of, or otherwise say anything about Mr. Davies's behavior toward or affecting, K.D.

The Court nevertheless does <u>not</u> credit Mr. Davies's total denial of this behavior.  In general, and as discussed in greater detail below, Mr. Davies was not a credible witness, and this topic is no exception.  The larger point is that the Court finds Mr. Davies's violence and psychological abuse to be serious and extremely damaging and dangerous.  It gives less weight to the allegations of sexual abuse.

G.      April 15, 2016, Incident

Perhaps the most dramatic incident described at trial took place on the evening of April 15, 2016.  The incident is significant for two reasons.  First, it further demonstrates Mr. Davies's erratic, violent, and frightening behavior toward Ms. Davies.  Second, Mr. Davies's testimony

about this incident was not truthful, which underscores the Court's view that Mr. Davies was generally not a credible witness.

Ms. Davies testified as follows:  On April 15, 2016, she went to the airport to pick up Mr. Davies, who had been on a business trip to Curacao.  When they returned home, a babysitter was supposed to come over so they could go out to dinner.  The babysitter did not come, so they stayed in instead, which irritated Mr. Davies.  Then, at around 9:00 p.m., Mr. Davies noticed that a palm tree had been knocked over, and he became angry at Ms. Davies because no one had put it back upright.  He got red in the face and began to scream and yell at Ms. Davies that she did not respect or care about him or work hard enough, and that "if it didn't change then it was going to end in divorce."  (Tr. at 109).  She replied, "fine, let's just get divorced."  (Id.).  At that point, Mr. Davies "picked up his wine glass and he hurled it at [Ms. Davies] and it crashed" against a wall, sending glass everywhere.  (Id. at 109-10).  Then, Mr. Davies kicked the glass patio door twice, shattering the glass and severely cutting his foot.  Ms. Davies credibly described this series of events as "so explosive and . . . really scary."  (Id. at 110).   She testified, and presented video and photograph evidence which confirmed, that Mr. Davies's foot began to bleed profusely, and as he walked across the floor – stopping to berate Ms. Davies further on his way out of the house – he left bloody footprints along the way.

Ms. Davies testified the commotion woke K.D. who had been sleeping, and when Mr. Davies left the house, she saw K.D. standing by the bathroom.  Ms. Davies testified that both she and K.D. were crying and K.D. asked why his father had kicked the door.  Ms. Davies then gave K.D. a cartoon video on a computer, told him everything was okay, and locked him in his room so that he would calm down and not step on the broken glass.  (Tr. at 114).

Mr. Davies's version of the events is as follows:  He claimed the glass door got jammed, so he tried to push it with his foot, his foot slipped, and it hit the "cheap, nasty, horrible, thin island glass" of the door, which shattered, accidentally cutting his foot.  (Tr. at 1164).  Mr. Davies testified that he walked through the house toward the door, stopping occasionally "to consider how [he was] going to stop the bleeding," and he stopped in the kitchen, "[r]eached over, grabbed [a] tea towel," which "knocked a wine glass onto the floor that was next to the wine bottle on the side, on top of the dishwasher."  (Id. at 1173).  He then claims he exited the house to tend to his wound in the front yard where he knew there was no glass, before driving himself to the hospital.

The Court credits Ms. Davies's testimony and discredits Mr. Davies's testimony.

The video and photographic evidence shows Mr. Davies sustained a very serious injury from this incident, which is inconsistent with his description of his foot "slipping" into the glass. Moreover, the magnitude of the injury and the quantity of the blood makes it unbelievable that Mr. Davies chose to leave the house to tend to his wound outside instead of sitting on a chair in plain view in the photographs.  Instead, the Court credits Ms. Davies's testimony that Mr. Davies stormed out still in a fit of anger.  Moreover, the video and photographic evidence make clear that Mr. Davies would have had to have reached half-way across the room from where one of his bloody footsteps shows he was standing in order to reach the tea towel and knock the wine glass off the counter.  None of this is remotely plausible.  What is plausible – and what the Court finds did occur – is what Ms. Davies said: Mr. Davies was violently angry, threw the wine glass, kicked the glass door, and stopped to berate her at least twice on his way out of the house.  This incident therefore supports Ms. Davies's contentions that Mr. Davies lacked control when he was angry and was becoming increasingly violent.

15

This incident also underscores Mr. Davies's erratic temper, and the extreme level of violence he exhibited on numerous occasions.  This violence did not result in physical injuries to Ms. Davies or K.D. but it was demonstrably uncontrollable, and dangerous.

H.     Dr. Heitler

Shortly after the April 15, 2016, incident, the parties began couples' counseling via Skype, email, and phone, with Susan Heitler, a practicing psychologist based in Denver, Colorado, who testified as a fact witness at trial.[3]  Mr. and Ms. Davies participated in "approximately five" sessions together, and Ms. Davies participated in approximately nine more sessions individually.  (Tr. at 176).

Dr. Heitler provided credible testimony at trial.  Although the information she provided was self-reported by Ms. Davies to Dr. Heitler – in other words, it was not based on Dr. Heitler's first-hand knowledge of the underlying facts – the Court finds it to be consistent with Ms. Davies's credible testimony and that of other witnesses, and therefore finds it both credible and reliable.  In addition, the credibility of Dr. Heitler as a witness lends general credibility to Ms. Davies's account of her relationship dynamics with Mr. Davies, and in particular the highly dysfunctional domestic strife, violence, and psychological abuse she endured.

Dr. Heitler testified that Ms. Davies told her about interactions with Mr. Davies, and "scenes that took place between her husband and her son, which . . . raised enormous anxiety for her."  (Tr. at 185).  Dr. Heitler asked Ms. Davies to write and send via email a "list of incidents,"

---

[3]     The Court permitted Dr. Heitler to testify regarding her interactions and conversations with Ms. Davies, who waived the psychologist-patient privilege, but prohibited her from testifying regarding her interactions or conversations with Mr. Davies, who did not waive the privilege.  In addition, the Court admitted testimony and exhibits related to the statements made by Ms. Davies to Dr. Heitler not for the truth of the matters therein, but instead for the purpose of demonstrating what gave rise to Dr. Heitler's concern and advice.

and when Ms. Davies did that, it "set off alarm bells for [Dr. Heitler] because there were four to eight incidents a day of anger outbursts." (Id. at 187). Dr. Heitler testified that if what Ms. Davies told her was true, it indicated "a relationship that's controlling and coercive," and "not normal behavior." (Id. at 196).

Dr. Heitler testified regarding various things that concerned or alarmed her with respect to what Ms. Davies reported about her interactions with Mr. Davies. In particular, Dr. Heitler testified she was concerned Ms. Davies was "dissociating," which she described as "her mind goes somewhere else, out of her body, and that weak feeling and she can't think." (Id. at 214-15). She characterized this state as "extremely serious" because it suggested Ms. Davies was "under intense threat of harm . . . or actual harm." (Id. at 215).

Dr. Heitler testified she was also concerned by Ms. Davies's accounts of Mr. Davies's response towards "normal kid activity" by K.D. (Tr. at 216). She spoke in particular about the incident in which Mr. Davies threw his phone after K.D. jumped on the couch causing Mr. Davies's beer to spill. Dr. Heitler stated it showed "a lack of impulse control and rapid escalation of anger toward a child." (Id. at 216-17).

On May 25, 2016, Dr. Heitler wrote in an email to Ms. Davies, "I am very concerned for [K.D.]. He needs your protection." (RX 104). On June 29, 2016, Dr. Heitler wrote in another email, "I am concerned that [Mr. Davies] is escalating in danger with his throwing things. The situation is increasingly unsafe. You might check if there is an abuse hotline there. . . . Do you have a safe place to go if you find you and [K.D] need to leave in a hurry? Shame vis a vis your parents and sister might be safer than you staying where you are." (RX 103C). Dr. Heitler testified she recommended to Ms. Davies that she leave St. Martin, and that she, Dr. Heitler, "couldn't see any other options" besides going to the United States. (Tr. at 259).

I.      Days Leading Up to Departure from St. Martin

Ms. Davies credibly testified that on July 8, 2016, Mr. Davies became enraged when he discovered Ms. Davies had asked a friend for a key to the friend's house.  After an argument, Mr. and Ms. Davies agreed Mr. Davies would move out of the marital residence.  Mr. Davies stayed with a friend for one night and then in a hotel for the next nine nights.  However, Mr. Davies continued to return home for one to five hours each day during this "separation."  During this time, Mr. and Ms. Davies alternated nights with K.D.

During this period, Mr. and Ms. Davies discussed separating and dividing the business, such that Ms. Davies would run the French business with the manager, Wayne Palmer, and Mr. Davies would run the Dutch business.  Ms. Davies credibly testified that Mr. Davies did not stick with this proposed arrangement, instead changing his mind and making other proposals each time they seemed to agree on something.

In particular, Ms. Davies testified that on July 14, 2016, Mr. Davies changed his mind and declared in a fit of rage that he would "tak[e] control of everything."  (Tr. at 609).  During this discussion, Mr. Davies screamed at Ms. Davies and followed her and K.D. around the house yelling.  She described Mr. Davies "corner[ing]" Ms. Davies and K.D. in K.D.'s bedroom, and said that she eventually went outside because she thought "if [she] was outside maybe there would be some divers around and [Mr. Davies] would calm down if there were other people." (Id. at 610).  Ms. Davies credibly testified that Mr. Davies continued to yell, at which point K.D. drew a line in the sand with his foot and told his father to stay on one side of the line, and "stay away from mummy."  (Id.).  Mr. Davies continued to scream at Ms. Davies for another ten minutes before finally leaving.  Ms. Davies took K.D. and they slept at her friend's house that

evening because Ms. Davies "was scared that [Mr. Davies] would come back to the house."
(Id.).

The next day, Ms. Davies met with Mr. Davies to again discuss the separation, and Mr.
Davies told her "how it's going to be."  (Tr. at 611).  In particular, Mr. Davies said he would
give Ms. Davies $100,000 for the business in twenty monthly payments of $5,000 each, Ms.
Davies would move out of the house, they would continue to share custody of K.D., and they
would still go on a planned vacation to England together as a family.  Ms. Davies testified she
initially agreed to this proposal.  However, when Ms. Davies and Mr. Davies met again at the
beach with K.D. two days later, on July 17, 2016, Ms. Davies told Mr. Davies she wanted to talk
again about the agreement, because she "didn't think it was fair just to take $100,000 for two
businesses and four boats" especially when they "had so much in savings."  (Tr. at 612).  Mr.
Davies got angry, cursed at Ms. Davies, and then left.

Ms. Davies testified that shortly after he left the beach, Mr. Davies called Ms. Davies on
the phone.  He told her she "couldn't change the plan," and then threatened to "sink all the boats
. . . go to the French side and close the doors and fire everybody, . . . take all the money out of
the bank accounts and burn it, and that he would rather kill himself than take this through the
courts."  (Tr. at 612).  Ms. Davies nevertheless permitted K.D. to stay the night with Mr. Davies
because she felt she did not have any other choice.

That same evening, July 17, 2016, at 9:07 p.m., Mr. Davies emailed Ms. Davies with
another proposed agreement regarding their separation.  The email starts with a note telling Ms.
Davies "it would be a good idea" if she were to "start looking for somewhere to live" because
Wayne Palmer was going to move into their house.  (PX 57).  It goes on to say that it is a
"negotiable" offer, and that Mr. Davies's objective was to "be clear with each other, stop arguing

and hopefully . . . have some quiet time and get on with our lives, hopefully together." (Id.).

Under the proposed agreement, Ms. Davies would "sign all shares for Octopus Diving SXM NV

and Octopus Diving and Activity Center SARL" to Mr. Davies, for which Mr. Davies would pay

Ms. Davies a total of $110,000, and Ms. Davies would be allowed to keep her car. The proposal

would also have Ms. Davies "agree[] that no further financial compensation can be sought from"

Mr. Davies, and it proposed that both parties would jointly "ensure the financial security" of

K.D. Finally, the proposed agreement states that "[s]hould Christopher E Davies and Sally K

Davies divorce, this agreement will act as the divorce settlement and no further financial

compensation can be sought from Christopher E Davies or Sally K Davies including assets,

businesses, companies or personal effects." (Id.).

Ms. Davies credibly testified that she became very afraid after these exchanges regarding

settlement and divorce, because she "felt that once [Mr. Davies] finally realized that [their]

relationship was over [she] was really scared of his reaction." (Tr. at 614-15).

J.    Decision to Leave

The following day, July 18, 2016, Ms. Davies left the house early because she knew Mr.

Davies planned to come by and she did not want to see him. She testified she went to the French

"gendarmerie" (police) because she felt unsafe and "really afraid and . . . concerned that [Mr.

Davies] would do something to [her]." (Tr. at 614).

Ms. Davies credibly testified that the police asked her whether Mr. Davies had beaten her

or hit her in the face, and when she said no, they asked her why, if her husband was so terrible,

had she not left a long time ago. The police then told Ms. Davies that her only option was to file

a criminal complaint, which required the police to interview Mr. Davies. Ms. Davies left without

filing a complaint because she thought if they interviewed Mr. Davies, he would "go even more

berserk and vengeful." (Tr. at 616). She testified she did not think the police would do anything that would immediately protect her from her husband's outrage, and therefore she felt desperate. She concluded that leaving the island, at least temporarily, was the only solution for getting out of an untenable situation.

Specifically, Ms. Davies said she decided to leave because "there was nowhere to be safe . . . [t]here was nowhere to go . . . you know everybody there . . . [a]nd [she] just wanted to go somewhere safe where [she] could eat and sleep and just not be afraid all the time." (Tr. at 618). Ms. Davies also testified her original plan was to leave the island only for a few days or a week, and to return once Mr. Davies had an opportunity to "calm down." (Id. at 629-30).

Wayne Palmer corroborated Ms. Davies's assertions that she left St. Martin out of fear of her husband, but that she planned to return a week or so later, once things calmed down. Specifically, Palmer testified Ms. Davies told him "she was considering leaving the island because [Mr. Davies] was being very volatile and she wanted the whole situation to calm down." (Tr. at 1097). He testified that Ms. Davies envisioned leaving for a week or ten days and then coming back. On cross-examination, Palmer testified Ms. Davies said she was going to leave the island because "she was frightened for both herself and K.D." (Id. at 1115). The Court found this contemporaneous expression of Ms. Davies's fear of Mr. Davies to be both credible and probative.

At 11:14 a.m. on July 18, 2016, Mr. Davies sent a text message to Ms. Davies: "I tried to have an amicable solution. You chose to make everything difficult. So today it changes. This is going to hurt badly." (RX 17). Thirteen minutes later, Mr. Davies wrote, "I need all accounts from 2008 to today made available. . . . I am having the accounts audited immediately." (Id.).

And one minute later he wrote, "I am still open to a simple settlement by 5pm today otherwise this turns nasty and very very expensive." (Id.).

Ms. Davies testified that after she left the police station, she called Dr. Heitler, who said "she was really concerned," and that "it was a good idea [for Ms. Davies to] le[ave] the island." (Tr. at 617).  Dr. Heitler corroborated Ms. Davies's testimony on this point.  She testified she recommended that Ms. Davies leave the island because she was concerned about her safety and that of K.D., in light of the "escalating situation," of "more and more rage," and Ms. Davies's reports of "how terrified she felt."  (Id. at 257).  Dr. Heitler clarified, however, that her concern was for the family as a whole.  She testified she made the recommendation to leave St. Martin at least in part so that things would not get to a point at which Mr. Davies would be jailed, which Dr. Heitler viewed as a suboptimal result for the ultimate goal of keeping the family together, in some form.  This testimony suggests Dr. Heitler did not think the conduct described by Ms. Davies arose to a level necessitating permanent removal of K.D. from St. Martin.  Rather, she seemed to be recommending a temporary separation, with the ultimate goal of an amicable solution.

Dr. Heitler's testimony in this regard arguably cuts against a permanent removal of K.D. from St. Martin.  However, as set forth below, the abuse did not end after Ms. Davies and K.D. left for the United States.  Moreover, Dr. Heitler testified she does not have any specific familiarity with St. Martin or the legal procedures in St. Martin, and, as set forth below, the Court finds the procedures available in St. Martin to be inadequate to protect Ms. Davies there. Finally, the Court agrees with Dr. Heitler that a permanent removal of K.D. from his father's care is neither a desirable nor a likely outcome of this litigation.  To be clear, this Court is not

making a ruling on custody or any related determination, and would not endorse Mr. Davies's having no access to his child.

After she spoke to Dr. Heitler, Ms. Davies called her parents who immediately bought her and K.D. plane tickets to New York.

K.       Continuation of Abuse After Separation

The abuse did not end after Ms. Davies and K.D. left St. Martin, however.  Instead, Mr. Davies continued to threaten Ms. Davies.  In particular, he accused her of embezzling money from the company,[4] threated legal proceedings and incarceration, and made "settlement offers" that were so unreasonable they were in fact threatening.

In particular, shortly after Ms. Davies arrived in the United States, she received a document with another supposed settlement offer.  Among other things, the proposal suggested that K.D. would reside with Mr. Davies and that Ms. Davies would pay Mr. Davies approximately $1 million.  This "proposal" was a disguised threat, and it – unsurprisingly – had the effect of frightening Ms. Davies even more.  (RX 8).

Kyle Thorpe's testimony corroborated this.  Specifically, Thorpe testified Mr. Davies told him and other employees that Ms. Davies had stolen anywhere between $5,000 and $500,000 from the company.  Moreover, according to Thorpe, Mr. Davies told his company's staff that no one would be paid their earned wages unless they gave Mr. Davies a good character reference in

---

[4]       Mr. Davies claimed in his reply brief and affidavit that Ms. Davies had embezzled money from the couple's companies.  However, he abandoned those allegations at trial.  Ms. Davies testified before she left she withdrew $5,000 from the company bank account, and took an additional $12,000-$13,000 she had in cash, to support herself and K.D. while they were away, and because she was concerned she would not have access to any money after she left St. Martin. The Court finds Ms. Davies's testimony to be credible and is untroubled by the withdrawal.  In any event, proof of Ms. Davies's embezzling money was wholly lacking at trial, so the Court rejects it as an alternative motive for Ms. Davies's decision to flee St. Martin.

this Hague Convention case.  The Court finds this testimony to be credible, and consistent with Mr. Davies's deceitful character.

Wayne Palmer also testified that the day Ms. Davies left, Mr. Davies came to the business and "proceeded to take all of the documentation and computers from the office that was located in the family home."  (Tr. at 1097).  Palmer assisted Mr. Davies in loading documents and computers into Mr. Davies's truck.  According to Palmer, Mr. Davies said he was taking the computers and documentation because Ms. Davies "had been embezzling the company of money and [Mr. Davies] was taking it to an accountant to be sorted out."  (Id. at 1098).  Palmer testified that over time, the amount of money Mr. Davies accused Ms. Davies of embezzling increased from $50,000 to $500,000.

Palmer also testified that in late July or early August 2016, Mr. Davies called a meeting of the staff of Octopus diving and told them that Ms. Davies had embezzled money from the company, and that the employees "were not going to be paid because [Ms. Davies] was forcing the company to become bankrupt."  (Tr. at 1104).  Palmer testified that after that meeting Mr. Davies asked Palmer for a character reference and told him that "if the staff wanted their wages, they all had to write him a character reference."  (Id.).

A few weeks after Ms. Davies and K.D.'s departure, in August 2016, Mr. Davies called Lisa Wightman's husband, who put the phone on speaker so Wightman could hear.  Wightman testified that Mr. Davies said Ms. Davies had kidnapped K.D., was "embezzling money from their business, . . . had gone to several banks and took tons of cash, . . . [and] took cash money from their house."  (Tr. at 557).  She further testified Mr. Davies told her husband, while Wightman listened, that Ms. Davies "was a lesbian . . . an alcoholic . . . [and] a drug abuser."  (Id.).

24

Two weeks later, Mr. Davies called Wightman's husband again, who again put the phone on speaker so Wightman could listen.   During that conversation, Mr. Davies said he had "a forensic accountant that looked over the books and that he was going to put [Ms. Davies] in jail." (Tr. at 557).  Mr. Davies also told Wightman's husband during this call he would make sure Ms. Davies "was never going to see K.D. again," Ms. Davies "was going to pay for what she did to" Mr. Davies, and "if he could get [Ms. Davies] on the island, the power was going to shift."  (Id. at 558).  Wightman also testified Mr. Davies sounded "venomous, poisonous" to her, but she perceived that Mr. Davies was "happy . . . that he was going to get" Ms. Davies.  (Id. at 558-59).

Wightman testified there was a third similar phone call a week or so later, during which Mr. Davies again reiterated "he was going to get [Ms. Davies] to rot in jail and that there was no amount of money that he would take to exact his revenge on her."  (Id. at 560).  Wightman testified she found this so upsetting she could no longer stay on the line.

On August 22, 2016, Mr. Davies sent Ms. Davies several messages in which he made veiled threats to have her jailed if she returned to St. Martin.  Mr. Davies did in fact commence a criminal proceeding against Ms. Davies on July 27, 2016.  In addition, Mr. Davies told friends his "ideal turnout" would be to have Ms. Davies in jail.  (Tr. at 1409).

III.   The Court's Evaluation of the Parties' Credibility

During trial, the Court found Ms. Davies to be a credible witness.  Her testimony was consistent throughout the proceedings and it was corroborated by numerous fact witnesses and documentary evidence.

This lies in stark contrast to Mr. Davies.  The Court found that very little of what Mr. Davies said was believable, primarily because it was completely contradicted by the testimony of numerous other witnesses called by Ms. Davies, and lacked any support from disinterested

25

witnesses.  In particular, Mr. Davies denied almost every single allegation made against him.  He claimed to be calm, cool, and collected at almost every moment, which is simply not believable under the weight of the evidence.  Mr. Davies denied punching walls or doors; denied pushing, grabbing, or strangling Ms. Davies or anyone else; denied hitting or pushing K.D.; and denied throwing things or threatening K.D. with harm.  If K.D. threw food on floor as a baby, Mr. Davies testified he would get down to his eye level and talk to him and not yell at him.  Mr. Davies denied ever throwing or breaking K.D.'s toys.  He denied stopping the car short when K.D. took off his seatbelt.

Mr. Davies also blamed others for every issue in his marriage and in his relationships with friends and employees.  He testified that unhappiness in his marriage with Ms. Davies was due, at least in part, to the fact that Ms. Davies would not agree to move to a different residence. He said that when he would be "having normal conversations with [Ms. Davies], in a normal, quiet voice, [Ms. Davies] would say [he] was becoming abusive and overcritical."  (Id. at 1141). He testified that when he had disputes with employees, Ms. Davies always took the employee's side, and the employee was always in the wrong.  Likewise, he blamed Dr. Heitler for the deterioration of his marriage.  He stated he was always calm and relaxed and Ms. Davies would simply walk out of the room, following Dr. Heitler's advice.

Mr. Davies testified that the first time Ms. Davies told him she was afraid of him was on July 8, 2016.   He stated this came out when the parties were "just getting K.D. ready to go to school," and Ms. Davies "was doing the dishes, and [Mr. and Ms. Davies] were talking about [their] relationship, and [Ms. Davies] just said, 'I'm scared of you.'"  (Tr. at 1143-44).  He testified that after this conversation, he moved out of the marital residence and "gave [Ms. Davies] the space that she asked for."  (Tr. at 1144).  However, on cross-examination, Mr.

Davies was confronted with documentary evidence that Ms. Davies told him she was scared of him as early as February and April 2012, and admitted that he returned to the marital residence every day during the July separation.

Finally, Mr. Davies's testimony at trial revealed that he previously lied to his St. Martin attorney and to the police.  The first example of this was when Mr. Davies testified regarding having been stopped and taken to the police station for driving while intoxicated in 2015.  His lawyer advised him to agree to have his license suspended in exchange for there being no criminal record.  Mr. Davies took that advice.  Then, sometime later, Mr. Davies's attorney advised Mr. Davies that he could get his license back if he had a residence on the Dutch side of the island.  Mr. Davies told his attorney he had a residence on the Dutch side where he resided on the weekends.  This was untrue.  Second, Mr. Davies filed a criminal complaint against Ms. Davies in St. Martin nine days after she left for the United States.  In the criminal complaint, he stated he "presume[d]" Ms. Davies was in the United States but did not have any idea where she actually was.  (RX 116).  However, the uncontroverted evidence as well as Mr. Davies's own testimony on cross-examination demonstrates he knew to a certainty that Ms. Davies was in the United States.

Overall, the Court found Mr. Davies to be very self-involved and condescending, and his testimony to be generally not credible in part because he thinks so highly of himself.  Again, it is simply not believable that Mr. Davies was always calm and relaxed whereas Ms. Davies was irrational, particularly in light of the evidence which dramatically skewed in the opposite direction.

Accordingly, the Court finds Mr. Davies's testimony on every significant contested issue to lack credibility.

## CONCLUSIONS OF LAW

This case is governed by the Hague Convention, the provisions of which have been implemented in the United States through the ICARA.

Both the United States and France – which includes its territories, such as French St. Martin – are signatories of the Hague Convention.

I.      The Hague Convention

The Hague Convention is designed to "'protect children internationally from the harmful effects of their wrongful removal by establishing procedures to ensure their prompt return to the State of their habitual residence,' so that the 'rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States,'" Souratgar v. Lee, 720 F.3d 96, 101-102 (2d Cir. 2013) (quoting Abbott v. Abbott, 560 U.S. 1, 32 n.6 (2010) and Chafin v. Chafin, 133 S. Ct. 1017, 1021 (2013)).  "The Convention's remedy of repatriation is designed to preserve the status quo in the child's country of habitual residence and deter parents from crossing international boundaries in search of a more sympathetic court."  Souratgar v. Lee, 720 F.3d at 102 (internal quotations omitted).

"[W]hen a parent wrongfully removes a child from one contracting state which is the child's country of habitual residence to another contracting state, the other parent may initiate a proceeding to repatriate the child to the first state."  Souratgar v. Lee, 720 F.3d at 102.

Once wrongful removal has been established, "the child must be returned unless the [respondent] can establish one of four defenses."  Blondin v. Dubois, 189 F.3d 240, 245 (2d Cir. 1999) (quotation marks omitted); see also 22 U.S.C. § 9001(a)(4).

"The decision concerning repatriation shall 'not be taken to be a determination on the merits of any custody issue.'"  Souratgar v. Lee, 720 F.3d at 102 (internal quotation omitted).

II.     Petitioner's Prima Facie Case

To "succeed on a petition for repatriation of a child under the Hague Convention, the petitioner must prove that the child was removed from a State party in which she was 'habitually resident,' and that the removal was 'wrongful.'"   Hollis v. O'Driscoll, 739 F.3d 108, 111 (2d Cir. 2014) (citation omitted).

Under Article 3 of the Convention, removal of a child is considered "wrongful" when "it is in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal."

The standard of proof by which the petitioner must prove his prima facie case is "by a preponderance of the evidence."   22 U.S.C. § 9003(e)(1)(A).

Here, the parties stipulated that K.D. was a habitual resident of French St. Martin.  (Doc. #36).  They also stipulated to sufficient facts to support a finding by a preponderance of the evidence that K.D.'s removal from French St. Martin was "wrongful."  In particular, the parties agreed Mr. Davies had custodial rights over K.D. under French law, and that at the time of K.D.'s removal Mr. Davies was exercising those rights.  Further, there is no dispute that Ms. Davies took K.D. with her to the United States without first informing or seeking the consent of Mr. Davies.

Accordingly, Mr. Davies has established his prima facie case for the return of K.D. to French St. Martin.

III.    Grave Risk of Physical or Psychological Harm

The central question in this case is whether Sally Davies has established by clear and convincing evidence that returning K.D. to French St. Martin would put K.D. at grave risk of physical or psychological harm.

The Court concludes Ms. Davies has satisfied that burden of proof, and further concludes that returning K.D. to St. Martin would put him at grave risk of psychological harm. Accordingly, the Court will not order the return of K.D. to St. Martin.

A.    Grave Risk of Harm

Article 13(b) of the Hague Convention provides, "the judicial or administrative authority of the requested State is <u>not</u> bound to order the return of the child if [the party opposing repatriation] establishes that . . . there is a <u>grave risk</u> that his or her return would expose the child to <u>physical or psychological harm or otherwise place the child in an intolerable situation</u>." (Emphasis added).

"Under Article 13(b), a grave risk of harm from repatriation arises in two situations: (1) where returning the child means sending him to a zone of war, famine, or disease; or (2) in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection." <u>Souratgar v. Lee</u>, 720 F.3d at 103 (internal quotations omitted). "The potential harm to the child must be severe, and the level of risk and danger required to trigger this exception has consistently been held to be very high." <u>Id</u>. (internal quotations omitted). "The grave risk involves not only the magnitude of the potential harm but also the probability that the harm will materialize." <u>Id</u>.  The grave risk exception "is to be interpreted narrowly, lest it swallow the rule." <u>Souratgar v. Lee</u>, 720 F.3d at 103.

The Second Circuit has described the grave risk determination as falling on a spectrum: "at one end of the spectrum are those situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences; at the other end of the spectrum are those situations in which the child faces

a real risk of being hurt, physically or psychologically, as a result of repatriation. The former do not constitute a grave risk of harm under Article 13(b); the latter do." Blondin v. Dubois, 238 F.3d 153, 162 (2d Cir. 2001).

"The exception to repatriation has been found where the petitioner showed a sustained pattern of physical abuse and/or a propensity for violent abuse that presented an intolerably grave risk to the child." Souratgar v. Lee, 720 F.3d at 104 (internal quotations omitted).  Evidence of "prior spousal abuse, though not directed at the child, can support the grave risk of harm defense, as could a showing of the child's exposure to such abuse.  Id. (internal quotations and citations omitted).

Many cases in which the grave risk defense is asserted, like this one, "arise from a backdrop of domestic strife, [but] [s]pousal abuse . . . is only relevant under Article 13(b) if it seriously endangers the child."  Souratgar v. Lee, 720 F.3d at 103-104.  "The Article 13(b) inquiry is not whether repatriation would place the respondent parent's safety at grave risk, but whether so doing would subject the child to a grave risk of physical or psychological harm."  Id. at 104.

In addition, "[s]poradic or isolated incidents of physical discipline directed at the child, or some limited incidents aimed at persons other than the child, even if witnessed by the child, have not been found to constitute a grave risk."  Souratgar v. Lee, 720 F.3d at 104.

The burden of proof for establishing grave risk of harm is "by clear and convincing evidence."  22 U.S.C. § 9003(e)(2)(A).  However, "[s]ubsidiary facts may be proven by a preponderance of the evidence."  Souratgar v. Lee, 720 F.3d at 103.

Finally, even where the grounds for a grave risk defense have been established, "the district court is not necessarily bound to allow the child to remain with the abducting parent." Blondin v. Dubois, 189 F.3d at 246 n. 4.

The Court is acutely aware of the need to interpret the grave risk exception narrowly. However, for the reasons that follow, the Court finds that K.D. has been exposed to significant violence and subjected to serious psychological abuse and that, in light of Mr. Davies's actions since Ms. Davies and K.D. came to the United States, there is a very real and serious risk – indeed, a grave risk – that that violence and psychological abuse would continue and increase if K.D. were returned to St. Martin.  Moreover, the Court concludes that St. Martin is incapable of adequately protecting K.D. against this risk.

B.        Violence and Psychological Abuse

Dr. Stephanie A. Brandt, a psychiatrist with over thirty years of clinical and academic experience, submitted a report and testified as an expert at trial.  The Court found Dr. Brandt to be amply qualified to testify on the matters at issue in this case.  She conducted three interviews of Ms. Davies in anticipation of trial, and she observed K.D. for a portion of one of those interviews.[5]  Dr. Brandt testified she found Ms. Davies to be credible in the history of abuse she described. Importantly, having presided over a nine-day trial of this case, the Court also finds Ms. Davies

_____

[5]        Dr. Brandt testified that during one of her meetings with Ms. Davies, she was able to observe K.D.  Based on her observations, Dr. Brandt reached several conclusions, including that K.D. "was obviously very, very preoccupied with violent themes of a sort that were way more intense than the average four-year-old," and that he "had many symptoms that are consistent with childhood" Post-Traumatic Stress Disorder.  (Tr. at 445-46).  However, the Court gives this testimony little weight because it was based on admittedly very limited interaction with K.D. and was not the basis of a formal diagnosis.  Moreover, Mr. Davies did not have an opportunity to have his own expert examine K.D.  As a result, the Court does not rely on Dr. Brandt's observations of K.D. in reaching its conclusions here.

credible in the history of abuse she described.  Thus, Dr. Brandt's opinion was based on testimony the Court itself finds credible.

Dr. Brandt summarized her expert opinion and conclusions as follows:

I concluded that this was a very severe case of domestic violence.  I concluded that the . . . mother was a victim of a particularly severe kind of domestic violence, which included strangulation.  I concluded that the child was witness to a great deal of violence and was also subject to a certain amount of violence himself.

(Tr. at 371).

In addition, Dr. Brandt diagnosed Ms. Davies with "a quite severe case of [Post-Traumatic Stress Disorder ("PTSD")] of a certain type called dissociative type."  (Tr. at 371).

Dr. Brandt also testified that domestic violence often escalates after a separation.  She explained this is because when the victim of abuse leaves, "the abuser has then lost control, and controlling the victim is an essential part" of the pattern of abuse.  (Tr. at 376).  Dr. Brandt further testified that the escalation after a separation can continue weeks, months, or longer after the separation, "often . . . through the child or through the legal system or through various financial threats."  (Id. at 377).

Dr. Brandt also testified regarding her opinions as to why Ms. Davies did not leave the abusive relationship at some earlier point in time.  She said there were several potential reasons for this, including chronic dissociation, "trauma bonding" with Mr. Davies, i.e. attachment to him and belief that he would change, and fear of retaliation from Mr. Davies and concern regarding what would happen to K.D. if she left.  (Tr. at 419-20).

In addition, Dr. Brandt testified that the criminal legal actions threatened or commenced by Mr. Davies against Ms. Davies in St. Martin suggest there is a high risk of domestic violence continuing or escalating in the near future.

Dr. Brandt further testified there is a consensus in the scientific community that the effects of abuse are essentially the same whether the abuse is directed at the child or whether the child is

witnessing the abuse.  The effect is the same because when a small child witnesses violence between

parents he is not capable of understanding anything other than that someone is in great danger.

Based on her observations, Dr. Brandt concluded that returning K.D. "to a place where this

[abuse] occurred and to the care of somebody who has abused the mother would set off a tremendous

traumatic reaction in" K.D.  (Tr. at 456).  She testified that there would be "a very high risk that

[K.D.] would become very symptomatic, and that would mean a delay . . . or change in his

developmental trajectory and not [in a] good direction."  (Id.).  She also testified that her opinion

would not change if K.D. resided part-time with Mr. Davies upon his return to St. Martin ("I don't

think there would be any substantial difference in the risk to the child being traumatized,

overwhelmed, and impaired."  (Id. at 458)), and that her opinion would be the same even if K.D. did

not reside with Mr. Davies at all.  (Id. at 459).

The Court credits and fully accepts these conclusions.  In particular, in light of the

overwhelming evidence of Mr. Davies's extreme violence and uncontrollable anger, as well as his

psychological abuse of Ms. Davies over many years, much of which was witnessed by K.D., and the

fact that Mr. Davies frequently screamed and yelled at K.D. for no legitimate reason, the Court

concludes that both Ms. Davies and K.D. are victims of severe domestic violence and that K.D. is at

serious risk of trauma and developmental delay if he were permitted to continue to experience and

witness the abuse.  The Court also credits Dr. Brandt's PTSD diagnosis as to Ms. Davies.  In

addition, the Court credits Dr. Brandt's testimony that domestic violence can continue even after the

parties have separated, and that that has happened here.  The Court is particularly concerned about

the escalation of violence just before Ms. Davies's and K.D.'s departure, and the continued and

increasingly hostile threats made after their departure, namely that Mr. Davies would seek to have

her imprisoned and try to take K.D. away from her.  Although these threats are addressed at Ms.

Davies, the Court concludes, based on Dr. Brandt's testimony, that K.D. is also a victim of the abuse

and has suffered and will continue to suffer if he is returned to St. Martin.

In sum, the evidence at trial showed beyond any doubt that Mr. Davies's behavior towards both Ms. Davies and K.D., and in K.D.'s presence, was extremely violent, unpredictable, outrageous, menacing, and dangerous.  It was a pervasive, manipulative violence that left few physical scars, but which was nonetheless severely damaging to Ms. Davies, and runs an almost certain risk of continuing to negatively affect K.D.  The testimony of Dr. Brandt is convincing on this point.

The Court does not make this decision lightly, and it fully understands the consequences and impact of the conclusions it is reaching here.  Nevertheless, the evidence clearly and convincingly shows that K.D. was the victim of severe psychological abuse and that the likelihood of its recurrence if he were returned to French St. Martin is a near certainty.

      C.     <u>French St. Martin's Geography and Legal System</u>

The Court takes judicial notice that the island of St. Martin, including both the French and Dutch territories, is approximately 34 square miles, with a population of approximately 73,435 total.[6] The French portion of the island is larger geographically but smaller in terms of population: it is 21 square miles, with a population of 31,949; the Dutch side is 13 square miles, with a population of 41,486.

The Court heard testimony from four expert witnesses on the topic of the legal system in French St. Martin and what protections are available to victims of domestic violence.

First, Ms. Davies called Francoise Brunet, a lawyer in private practice in French St. Martin, who devotes approximately 40 to 45 percent of her practice to family law.  Brunet credibly testified that in French St. Martin it is not possible to get an immediate order of protection in cases of psychological abuse.  She testified that under normal circumstances, to obtain an order of protection,

---

[6]    <u>See</u> UNITED STATES CENTRAL INTELLIGENCE AGENCY, WORLD FACTBOOK (last updated on January 12, 2017), entries on Sint Maarten and Saint Martin, available at: https://www.cia.gov/library/publications/the-world-factbook/geos/sk.html and https://www.cia.gov/library/publications/the-world-factbook/geos/rn.html.

one must send a written request to a clerk in Guadeloupe (there are no clerks in St. Martin), who issues a summons to the accused abuser.  This process takes at least fifteen days, and it can take more than a month before the parties are notified that they must appear in court.  According to Brunet, there is also an "exceptional method of summons," which is supposed to be more quickly obtained, but in her seventeen years of practice in St. Martin, she has never succeeded in obtaining one of these exceptional summons.  (Tr. at 1271).  Moreover, even if an order of protection is eventually granted, it expires after six months.  It can only be extended for one additional six month period, and only if divorce proceedings have commenced.  In addition, Brunet testified that an order of protection issued in French St. Martin is not effective in Dutch Sint Maarten.

Brunet also credibly testified that in her professional opinion, the legal system in place in St. Martin is not sufficient for the protection of domestic violence.  She testified that St. Martin is "a very small island, [different from] the big French territory . . . [where a] victim of psychological violence can hide."  (Tr. at 1271).  She said hiding is not possible in St. Martin.  As a result, her advice to victims of psychological violence in St. Martin is "protect yourself, leave."  (Tr. at 1284).

Audrey Gil, the director of Le Manteau, an organization that assists victims of domestic violence, also testified credibly at trial.  She testified that in the year and a half that she has worked as the director of Le Manteau, she has assisted twenty-three victims of domestic violence.  She testified Le Manteau is the only shelter for victims of domestic violence on French St. Martin, and that it has twelve beds.  She testified there is another shelter on the Dutch part of the island, which has five beds.  Gil testified the only guards at Le Manteau are unarmed and are only present during the night.  In addition, there are no security cameras at Le Manteau, it is not staffed 24 hours a day, and the address is not secret.  (Tr. at 1305-06).

Gil also credibly testified that in St. Martin "a woman . . . victim of domestic violence cannot hide.  Everybody knows everybody . . . .  Even if she goes out to go to the grocer[y store] or to buy

36

bread, there is a likelihood that she will . . . meet somebody who knows her husband." (Tr. at 1310-11). When asked her opinion regarding "the best course of action for a victim of domestic violence to ensure her safety" in St. Martin, Gil responded, "[l]eave the island." (Id. at 1313).

Mr. Davies also called two witnesses to testify as experts on these topics. First, Pascal Hippert, an attorney in St. Martin, testified regarding the procedure for obtaining an order of protection in French St. Martin. Although Hippert was generally credible, he had limited experience dealing with the issue of orders of protection in domestic violence cases. In particular, Hippert testified he had been practicing family law for less than three years, and in that time he had never applied for or received an order of protection for any client of his. In addition, on cross-examination, Hippert acknowledged that a large portion of his expert report was an exact copy of an article written by a different author available online. (Tr. at 1352-56).

In any event, Hippert's testimony regarding orders of protection in civil cases was not significantly different from that of Brunet. He testified that a victim of domestic violence must have a hearing before a judge to obtain an order of protection, and that it generally takes seven to fifteen days or more to obtain an emergency order of protection in St. Martin. Because this is considered the "emergency" order of protection, and you "cannot have [an] emergency within the emergency," it is not possible to obtain a temporary order of protection which would apply during the time the applicant is waiting for the emergency order of protection. (Tr. at 1367).

Mr. Davies also called Jean-Marie Thevenet, a former gendarme (police officer) who now runs an "association of assistance to victims," called Le Trait D'Union. (Tr. at 1460, 1474). The Court found Thevenet to be credible, but his testimony was of limited probative value. In particular, Thevenet testified his experience is primarily in criminal, not civil, law. In addition, he testified that the ability for a victim to obtain an order of protection depends on the circumstances; i.e., the victim is more likely to succeed in obtaining an order of protection if the evidence of violence is strong, and less likely to obtain an order of protection if the evidence is weak. (Tr. at 1479-80, 1482-83).

Based on the expert testimony and that of the fact witnesses, the Court finds and concludes that because of the nature and extent of the allegations here, the procedures in place in St. Martin are insufficient to protect Ms. Davies and K.D.  In particular, it would not be possible to ensure Ms. Davies's and K.D.'s safety from Mr. Davies in St. Martin because of the inability to obtain an order of protection in a timely manner, especially in a case involving little evidence of physical harm, and also because of Mr. Davies's demonstrated willingness to lie and belief that the law does not apply to him.  In addition, Mr. Davies continued to threaten Ms. Davies with legal action and imprisonment in St. Martin even after she left the island.  Finally, Ms. Davies and K.D. would be unable to adequately hide on such a small island.

IV.   <u>Undertakings or Ameliorative Measures</u>

Having determined that the grave risk of harm defense has been established by clear and convincing evidence, the Court must next consider whether there are "any ameliorative measures (by the parents and by the authorities of the state having jurisdiction over the question of custody) that can reduce whatever risk might otherwise be associated with a child's repatriation." <u>Blondin v. Dubois</u>, 189 F.3d at 248.  In other words, the Court must consider whether the child could be protected from grave risk "while still honoring the important treaty commitment to allow custodial determinations to be made – if at all possible – by the court of the child's home country."  <u>Id</u>.

The Court must examine "the range of remedies that might allow <u>both</u> the return of the child[] to [his] home country <u>and</u> [his] protection from harm, pending a custody award in due course by a [court in the country of the child's habitual residence] with proper jurisdiction." <u>Blondin v. Dubois</u>, 189 F.3d at 249.  Thus, "[i]n cases of serious abuse, before a court may deny repatriation on the ground that a grave risk of harm exists under Article 13(b), it must examine

the full range of options that might make possible the safe return of a child to the home country."
Blondin v. Dubois, 238 F.3d at 163, n.11.

Here, Mr. Davies testified he would agree to a mutual "stay away" order, and he would pay for Ms. Davies to have an apartment or house in a private gated community.  (Tr. at 1196). Mr. Davies further points out in his post-trial brief, consistent with his testimony at trial, that Ms. Davies could stay with her friend, Emma, who "lives in a gated community where [Ms. Davies has] previously stayed and which has 24-hour security and cameras."  (Pet. Br. at 20).  Mr. Davies also points to the testimony of the legal experts detailed above regarding the various legal processes in place and available to victims of domestic violence in St. Martin, which he suggests are adequate to protect Ms. Davies and K.D. if he were repatriated.  Finally, Mr. Davies argues that there is "no basis to find that [Ms. Davies's allegations] would [cause grave psychological harm] in the period necessary for [Ms. Davies] to obtain custody in St. Martin," and therefore, there is no imminent danger of harm before a custody determination would be made in St. Martin.  (Id. at 23).

The Court rejects all of these arguments.

First, Mr. Davies admitted that even when he agreed to stay away from Ms. Davies during early July 2016, he in fact went to their home, where he knew Ms. Davies was staying, every day, and stayed for several hours on some occasions.  Moreover, Mr. Davies repeatedly lied at trial, and the evidence shows he has tried to circumvent the law in St. Martin when he does not agree with its application to him.  Therefore, Mr. Davies cannot be trusted to honor any agreements or commitments he might make.  In short, the Court finds that Mr. Davies would not abide by a stay away agreement if K.D. were returned to St. Martin.

Second, several experts in St. Martin testified regarding the extremely small size of the island and its community, and the resulting inability to hide or avoid one's abuser there.  Also, Ms. Davies credibly testified that even in the gated community where her friend lives, she would not be safe because guards routinely let Caucasian people driving nice cars (such as Mr. Davies) through the gate even without checking their identification.  In any event, there was no testimony from Ms. Davies's friend, Emma, at trial, so the Court has no way of knowing if Emma would even agree to have Ms. Davies stay with her for any significant period of time.

Third, as discussed in greater detail above, the Court finds the legal system in St. Martin to be inadequate to protect Ms. Davies and K.D. from Mr. Davies's abuse.  Specifically, orders of protection are both difficult to obtain and take a long time to obtain, and the island is too small for someone to successfully hide.   Moreover, the explicit advice from two of the legal experts who testified was that when one is faced with domestic violence and psychological abuse, the best course of action is to leave the island.

In addition, the circumstances just prior to and since Ms. Davies's departure with K.D. – namely the escalation of Mr. Davies's violent and abusive behavior; his baseless allegations of embezzlement; the evidence of Mr. Davies's untruthfulness; his ready willingness to lie to authorities to get what he wants; and his stated desire to have Ms. Davies incarcerated – all suggest that the risk of harm to Ms. Davies and K.D. is immediate.

Finally, the Court has concluded (see supra at pp. 34-35) that K.D. would be severely traumatized if he were returned to St. Martin – the place where the abuse occurred – regardless of whether he resided with Mr. Davies full-time, part-time, or not at all.  There are no measures that could mitigate that trauma, other than permitting K.D. to remain in the United States.

In short, the Court finds there are no ameliorative measures that would protect K.D. from harm if K.D. were returned to St. Martin even during custody proceedings.  See Elyashiv v. Elyashiv, 353 F. Supp. 2d 394, 401, 408–09 (E.D.N.Y. 2005) (expressing concern that the father would not comply with orders limiting contact with the children and finding there were "no alternative arrangements that could effectively mitigate the grave risk to [the children] even if they did not live with their father.").

## CONCLUSION

For the foregoing reasons, the Court concludes that if K.D. were returned to French St. Martin, regardless of custody arrangements and regardless of whether he would spend any time with Mr. Davies, Mr. Davies's extreme psychological abuse of Ms. Davies and K.D. would continue and escalate, there is a grave risk that K.D. would be exposed to severe psychological harm, the procedures in place in French St. Martin would be insufficient to protect K.D., and there are no ameliorative measures that could reduce the grave risk of harm.

The Court declines to order the return of K.D. to French St. Martin.

The Verified Petition for Return of the Child to Saint Martin is therefore DENIED.

The Clerk is instructed to enter Judgment in respondent's favor and close this case.

Dated: January 25, 2017
       White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge

41